Ward Trucking Corp. v. Commissioner.
Ward Trucking Corp. v. Commissioner
Docket No. 2163-63.
United States Tax Court
T.C. Memo 1965-40; 1965 Tax Ct. Memo LEXIS 288; 24 T.C.M. (CCH) 217; T.C.M. (RIA) 65040; February 26, 1965
*288 Held, that the salary and bonuses paid by petitioner to its executive vice president and to its secretary-treasurer in the taxable years 1959 and 1960 were fair and reasonable and were deductible by petitioner as ordinary and necessary business expenses under section 162, I.R.C. 1954. Held, further, that the Commissioner erred in disallowing as ordinary and necessary business expenses $4,000 of the amount paid to its executive vice president and $4,000 of the amount paid to its secretary-treasurer in the taxable year 1959 and he also erred in disallowing $5,000 as to each in the year 1960. Sherwin T. McDowell and Robert E. McQuiston, for the petitioner. Max J. Hamburger, for the respondent. BLACK Memorandum Findings of Fact and Opinion Respondent has determined deficiencies in the income tax of petitioner for the calendar years 1959 and 1960 in the respective amounts of $5,480.16 and $31,281.27. The deficiencies are due to three adjustments made by respondent to the income reported by petitioner on its income tax returns filed for said years. Two of the adjustments have been settled by agreement of petitioner and respondent and no details will be given herein as to those adjustments. The adjustment which is contested by petitioner is described in the deficiency notice as follows: It is also determined that compensation including bonus paid to G. William Ward, an officer and stockholder, and claimed as a deduction by you, was excessive to the extent of $4,000.00 for the taxable year ended December 31, 1959 and $5,000.00 for the taxable year ended December 31, 1960. It *290 is similarly determined with respect to J. Richard Ward, an officer and stockholder, that the total compensation paid to him and claimed as a deduction was excessive to the extent of $4,000.00 for the taxable year ended December 31, 1959 and $5,000.00 for the taxable year ended December 31, 1960. By appropriate assignments of error petitioner contests the compensation disallowed which the Commissioner determined in his deficiency notice. Findings of Fact A stipulation of facts with exhibits attached was filed at the hearing and is incorporated herein by this reference. There was considerable oral testimony at the hearing. Petitioner is a corporation organized on March 20, 1947, and existing under the laws of the Commonwealth of Pennsylvania, with its principal office at Altoona, Pa. During the entire period material to this case, petitioner kept its books of account and filed its Federal income tax returns on the accrual basis of accounting and by calendar year. Petitioner filed its income tax returns for each of the taxable years 1959 and 1960 with the district director of internal revenue at Philadelphia, Pa. During all times pertinent to this case petitioner was, and *291 still is, engaged in the interstate trucking business subject to the rules of the Interstate Commerce Commission, hereinafter sometimes referred to as the ICC. It is classified by the ICC as a Class I common carrier of general freight operating principally in the middle Atlantic region. Petitioner operates in a territory from central Pennsylvania through New Jersey and the metropolitan New York area, encompassing 17 counties in Pennsylvania, 10 counties in New Jersey, and 8 counties in New York. William W. Ward and his wife, Dorothy C. Ward, founded the trucking business, now conducted by petitioner, on May 13, 1931. The business has grown considerably since its inception as a single truck operation. Petitioner has, for many years, been recognized as one of the leaders in profit performance in the industry. Petitioner's gross receipts and taxable income for the years 1947 to 1960, inclusive, were as follows: Year
Gross Receipts
Taxable Income
1947
$ 926,556.36
$153,947.98
1948
1,147,073.47
190,733.58
1949
1,323,195.07
184,504.54
1950
1,863,355.03
261,004.87
1951
2,269,953.97
250,742.56
1952
2,668,567.77
288,781.98
1953
3,068,626.86
329,240.45
1954
3,096,211.60
441,017.11
1955
3,574,924.00
491,851.37
1956
3,929,596.41
553,794.16
1957
4,198,562.51
506,063.88
1958
4,176,051.16
499,107.44
1959
4,804,877.77
501,276.74
1960
4,781,947.06
465,083.81
*292 Petitioner's operating revenue was derived primarily from two sources: (a) from the transportation of on-line freight (freight which petitioner both originated and delivered), and (b) from the transportation of off-line freight (freight which petitioner transported in conjunction with another carrier or carriers). Of the two types of freight, the transportation of off-line freight is less profitable. Because of its location, petitioner transported a greater percentage of off-line freight than did the average motor carrier in the industry. Petitioner at all times pertinent to this case operated, in addition to its general offices in Altoona, six separate terminals - five in Pennsylvania and one in New Jersey. Petitioner operated and maintained over 300 trucks, tractors, and trailers, having an original cost in 1959 of $1,593,000 and utilized a labor force numbering in the hundreds. Petitioner had a net worth of approximately $2,028,070.85 at the end of 1958. This had increased to approximately $2,267,189.47 and $2,526,686.51 by the end of 1959 and 1960, respectively. The motor carrier industry is a competitive industry. Petitioner was in direct competition with other common *293 motor carriers of general freight. In addition, petitioner competed with Railway Express, Air Freight, Greyhound Bus Company, United Parcel Service, Pennsylvania Railroad, New York Central Railroad, Baltimore & Ohio Railroad, Western Maryland Railroad, certain carriers who do not have proper certificates, and private carriers. From the date of petitioner's organization, William W. Ward and Dorothy C. Ward have served on its board of directors. Alberta Ward Davis, a sister of William W. Ward, served as a director from the date of its organization until her death in 1958. G. William Ward and J. Richard Ward, sons of William W. Ward and Dorothy C. Ward, have served as directors since their election on July 3, 1959. Petitioner's outstanding stock was owned either directly or indirectly by members of the Ward family. It had outstanding 2,673 shares of stock in 1958 and 1959. In 1960 petitioner declared a stock dividend of an additional three shares of common stock for each share held. Thereafter it had 10,692 shares of stock outstanding and all of it was owned either directly or indirectly by members of the Ward family. During 1959 petitioner paid a dividend of $6 for each share of *294 common stock outstanding. In July 1960, after the stock dividend, petitioner paid a dividend of $1.50 for each share of common stock then outstanding. William W. Ward has served as president of petitioner since its incorporation in 1947. During the period 1947 through 1956 he devoted all of his time to petitioner's affairs. However, beginning in 1957 and through 1960 he was forced, because of other activities including civic and community affairs, to devote approximately 80 percent of his time to petitioner's business. By 1959, William W. Ward felt himself in need of some men of ability to aid him in managing petitioner's entire system. In January 1959, G. William Ward, who was petitioner's assistant director of operations and safety, and J. Richard Ward, who was petitioner's assistant secretary-treasurer, were for the first time given the responsibility of going beyond the confines of a single department. From that time on both men shared the responsibility with petitioner's president of helping to operate and manage petitioner's entire system, including the formulation of petitioner's policy. G. William Ward and J. Richard Ward, along with William W. Ward, were the only individuals *295 who had, during 1959 and 1960, the responsibility for the operation of petitioner's entire system. On July 3, 1959, G. William Ward and J. Richard Ward were elected officers of petitioner, G. William Ward being elected executive vice president and J. Richard Ward being elected secretary-treasurer. From the age of 16 until the time he became a full time employee of petitioner, G. William Ward spent his summers and vacations working for petitioner in various departments, thus enabling him to become [*] with petitioner's operations at an only age. He joined petitioner as a full time employee in November 1956 as assistant director of operations and safety and prior to becoming an officer worked with all departments of petitioner. During this period he developed the cooperation and goodwill of petitioner's customers and employees. He had an excellent education which was culminated by his receipt in 1953 of a degree from the Wharton School of Business of the University of Pennsylvania, where he had been a transportation major. He is also the author of a thesis concerning safety in the motor carrier industry and has from time to time been called upon to lecture on efficient terminal management *296 at Pennsylvania State University. He served in the United States Navy during 1953-1956 and was assigned to transport duty on transport ships for the United States Marines. J. Richard Ward had, since the age of 16, been a part time employee of petitioner, working in numerous departments during his summers and vacations. By so doing he was able to gain an insight into petitioner's business at an early age. He joined petitioner as a full time employee in June 1955 as assistant manager in the customer relations department. When a suitable replacement was found for him he moved on to the traffic department where he made a complete study of the methods and operational procedures of that department. Due to the health of Alberta Ward Davis, the then secretary-treasurer of petitioner, he assumed a portion of her duties and responsibilities in December 1956 and was elected assistant secretary-treasurer the following February. J. Richard Ward had a good academic background, including the receipt by him of a bachelor's degree from Princeton University in 1955. As officers of petitioner and members of its top management team, G. William Ward and J. Richard Ward each devoted substantially all *297 his time to petitioner's affairs during 1959 and 1960. Both men spent in excess of 40 hours each week in petitioner's office building working on petitioner's affairs, plus additional time outside the office attending meetings and visiting petitioner's terminals. In his capacity as executive vice president, G. William Ward devoted his time primarily to coordinating and conducting petitioner's six terminal operations. J. Richard Ward, as secretary-treasurer, devoted a substantial portion of his time to the financial affairs of the entire system. Petitioner had an established practice of utilizing incentive bonus plans based on profit performance as a method of compensating all its employees. Incentive bonus plans dependent upon profit performance are common in the motor carrier industry. In January 1959 petitioner established an executive bonus plan which was and still is in existence. Under this plan the executive vice president and the secretary-treasurer (as the only officers, with the exception of the president, responsible for petitioner's entire business operation) are paid at the end of the year a bonus if petitioner's operating ratio for the year is kept to a figure less than *298 90 percent. The bonus, if it is paid, is equal to the lesser of (a) one-eighth of 1 percent of petitioner's gross operating revenue for the year, or (b) $5,000. The term operating ratio, as used in the motor carrier industry, is defined as the total expenses of a carrier for a given year, divided by its gross operating revenue for the year, expressed as a percentage. Petitioner's principal motive in establishing the executive bonus plan was to furnish an incentive to reverse the trend toward what appeared to be an inevitable operating ratio of 90 percent or more for 1959. Petitioner's gross operating revenue had decreased in 1958 for the first time since petitioner's incorporation in 1947; the tonnage handled had decreased in 1958; petitioner's employees had during 1958 been granted substantial wage increases in a total amount equal to approximately 5 percent of petitioner's gross operating revenue. Petitioner's operating ratio for the year 1959 was 86.6 percent and for the year 1960 was 89.6 percent. The average operating ratio of all common carriers of general freight in the middle Atlantic region of the ICC was 96.6 percent in 1959 and 98.5 percent in 1960. The operating *299 ratio achieved by petitioner for the years 1959 and 1960 made it one of the most successful motor carriers in profit performance in the middle Atlantic area. The efforts made by G. William Ward constituted a substantial contribution to petitioner's superior profit performance in 1959 and 1960. In addition to his regular duties as executive vice president of petitioner, G. William Ward initiated and carried out a program for minimizing costs and promoting efficiency which included better coordination of costs and expenses at each of petitioner's six terminals, the purchase of new and more efficient equipment, and a revision in petitioner's methods and procedures for scheduling the transportation of freight. The efforts made by J. Richard Ward constituted a substantial contribution to petitioner's superior profit performance in 1959 and 1960. He set out to increase petitioner's operating revenue and tonnage handled by soliciting new business both from customers and connecting carriers, by making continuous checks on the progress being made by petitioner's salesmen, and by reducing his new ideas for revenue improvement to workable programs. For services rendered during the year *300 1959, G. William Ward and J. Richard Ward each received from petitioner $22,012.50, which sum was composed of a base salary of $15,250, a Christmas bond and bonus (given all management employees) of $1,562.50, a bonus paid pursuant to the incentive bonus plan (participated in by 24 employees) of $200, and a bonus paid pursuant to the executive bonus plan of $5,000. For services rendered during the year 1960, G. William Ward and J. Richard Ward each received from petitioner $23,572.50, which sum was composed of a base salary of $15,850, a Christmas bond and bonus (given all management employees) of $1,622.50, a bonus paid pursuant to the incentive bonus plan (participated in by 24 employees) of $1,100, and a bonus paid pursuant to the executive bonus plan of $5,000. Of the total compensation paid G. William Ward and J. Richard Ward for services rendered during 1959 and 1960, only the base salary was guaranteed. Payment of the Christmas bond and the Christmas bonus was contingent upon a successful operation for the first 11 months of the year; payment of a bonus pursuant to the incentive bonus plan was also contingent upon a successful operation and was computed on the basis of *301 petitioner's operating ratio, revenue increase, and tonnage handled; payment of a bonus pursuant to the executive bonus plan was contingent upon an operating ratio of less than 90 percent for the year. Petitioner's president william W. Ward determined that the compensation paid the executive vice president and secretary-treasurer for services rendered during 1959 and 1960 was fair and that it "is generally in the area, and in most cases it's less than" the salaries paid by other comparable motor carriers to officers performing similar duties. T. B. Alfriend testified relative to the compensation paid petitioner's executive vice president and secretary-treasurer for services rendered during 1959 and 1960 that the compensation in question was comparable to the compensation paid in the industry to men of similar abilities who were occupying analogous positions and that in his opinion the compensation paid to G. William Ward and J. Richard Ward in each year was reasonable. Alfriend is chief executive officer of the Middle Atlantic Conference and is familiar with the wage scales in the motor carrier industry. Earl N. Hoekenga, after studying applicable facts and figures, testified *302 that the compensation paid petitioner's executive vice president and secretary-treasurer for services rendered during 1959 and 1960 was "fair and reasonable under the circumstances" and comparable to that paid by comparable carriers for like services. Hoekenga is associated with one of the oldest and largest general management consulting firms in the country located at Chicago, Ill. It is his responsibility to supervise a great deal of the work that his firm does in the transportation area and almost all of the work that his firm does for the motor freight industry. He has made a careful study of the motor freight industry throughout the country and the salaries paid by them for management personnel. The opinion that he has given as to the reasonableness of the salaries paid to G. William Ward and J. Richard Ward in the respective taxable years is based on that study. A comparison of petitioner's operating ratio for the years 1959 and 1960 with the ratios of 47 comparable carriers discloses that only one carrier of the 47 managed to achieve a better operating ratio than petitioner's. This carrier paid each of its two vice presidents and its secretary-treasurer more compensation than *303 petitioner's executive vice president and secretary-treasurer combined. August Gerlitz was, from the organization of petitioner until 1955, manager of petitioner's eastern operations. He received from petitioner the following compensation for services rendered during the indicated years: Year
Amount
1951
$18,080.05
1952
20,078.82
1953
24,593.00
1954
23,961.53
1955
26,873.15
Ward Terminals, Inc., is a corporation organized on March 4, 1948, under the laws of the Commonwealth of Pennsylvania, having its principal place of business in Altoona, Pa. Ward Terminals, Inc., was and still is engaged in the business of renting real estate. It holds title to real estate used by petitioner in its business and leases the real estate to petitioner. During 1959 and 1960, G. William Ward served as secretary of Ward Terminals, Inc., and J. Richard Ward served as treasurer, each receiving for services rendered the sum of $2,500 per year. Truc-Kar Rentals, Inc., was organized for the purpose of leasing passenger cars, trucks, trailers, and tractors on a long-term basis. In 1960 it was merged into the Ward Corporation of Pennsylvania. Both G. William Ward and J. Richard *304 Ward served as officers of this corporation during 1959 and 1960. They received no compensation for services rendered during 1959 but each officer did receive $500 for services rendered during 1960. Ward Warehousing Corporation was engaged in general warehousing in Altoona. G. William Ward and J. Richard Ward served as officers of this corporation during 1959 and 1960. They received no compensation from Ward Warehousing Corporation. G. William Ward and J. Richard Ward spent only a nominal amount of time during 1959 and 1960 on the affairs of Ward Terminals, Inc., Truc-Kar Rentals, Inc., (later Ward Corporation of Pennsylvania), and Ward Warehousing Corporation. Petitioner deducted on its Federal income tax returns for the years 1959 and 1960 the compensation paid G. William Ward and J. Richard Ward, viz, $22,012.50 paid each of the men for services rendered during 1959 and $23,572.50 for services rendered during 1960. For the calendar year 1959, respondent disallowed as a deduction from petitioner's 1959 gross income, $4,000 of the $22,012.50 paid G. William Ward, executive vice president, for services rendered during the year and $4,000 of the $22,012.50 paid J. Richard Ward, *305 secretary-treasurer, for services rendered during the year. For the calendar year 1960, respondent disallowed as a deduction from petitioner's gross 1960 income, $5,000 of the $23,572.50 paid by petitioner to G. William Ward, executive vice president, for services rendered during the year and $5,000 of the $23,572.50 paid J. Richard Ward for services rendered during the year. Compensation in the amount of $22,012.50 paid by petitioner to its executive vice president, G. William Ward, and to its secretary-treasurer, J. Richard Ward, for services rendered during the year 1959 was fair and reasonable. Compensation in the amount of $23,572.50 paid by petitioner to its executive vice president, G. William Ward, and to its secretary-treasurer, J. Richard Ward, for services rendered during the year 1960 was fair and reasonable. Opinion BLACK, Judge: The only issue for decision in this case is whether the compensation paid by petitioner to its executive vice president, G. William Ward, and secretary-treasurer, J. Richard Ward, for services rendered during the years 1959 and 1960 was reasonable within the meaning of section 162(a)(1) of the Internal Revenue Code *306 of 1954 and Income Tax Regs. printed in the margin. [1]
*307 It is, of course, true that the determination of respondent that the combined basic salaries and bonuses paid to G. William Ward and J. Richard Ward to the extent of $4,000 each for the taxable year 1959 and $5,000 each for the taxable year 1960 should be disallowed as deductions to petitioner because unreasonable is presumed to be correct and that the burden of proof is upon petitioner to show that respondent's determination is incorrect. Botany Worsted Mills v. United States, 278 U.S. 282. We think petitioner has met its burden of proof and that the facts found in our Findings of Fact show that all things considered the salary and bonuses paid to G. William Ward, as executive vice president of petitioner, and to J. Richard Ward, as secretary-treasurer of petitioner, were reasonable and should be allowed as deductions to petitioner in the respective taxable years. T. B. Alfriend, executive vice president of the Middle Atlantic Conference, a membership organization of motor common carriers, testified at the hearing that in his opinion the compensation paid by petitioner to G. William Ward, executive vice president of petitioner, and to J. Richard Ward, secretary-treasurer *308 of petitioner, in each of the taxable years was reasonable. Earl N. Hoekenga, who is associated with A. T. Kearney and Company of Chicago and who has had much experience with the motor freight industry, testified at the hearing that the compensation paid to G. William Ward, executive vice president of petitioner, and to J. Richard Ward, secretary-treasurer of petitioner, in 1959 and 1960 was fair and reasonable under the circumstances and comparable to that paid by comparable carriers for like services. It is true, of course, that we do not have to accept the testimony of these two expert witnesses but we think that it should be given serious consideration. We think it is supported, as a whole, by the evidence which is in the record. What is a reasonable compensation is a question of fact to be determined from the evidence. We think the facts in this case sustain petitioner. Two other adjustments having been made by respondent in his determination of the deficiencies and these two adjustments having been settled by agreement of the parties, Decision will be entered under Rule 50. Footnotes
1. Internal Revenue Code of 1954: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; Income Tax Regs.: Sec. 1.162-7. Compensation for Personal Services. (a) There may be included among the ordinary and necessary expenses paid or incurred in carrying on any trade or business a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services. (b) The test set forth in paragraph (a) of this section and its practical application may be further stated and illustrated as follows: (1) Any amount paid in the form of compensation, but not in fact as the purchase price of services, is not deductible. An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services and the excessive payments correspond or bear a close relationship to the stockholdings of the officers or employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock. An ostensible salary may be in part payment for property. This may occur, for example, where a partnership sells out to a corporation, the former partners agreeing to continue in the service of the corporation. In such a case it may be found that the salaries of the former partners are not merely for services, but in part constitute payment for the transfer of their business. (2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. (3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned. (4) For disallowance of deduction in the case of certain transfers of stock pursuant to employees stock options, see section 421 and the regulations thereunder. Sec. 1.162-9. Bonuses to Employees. Bonuses to employees will constitute allowable deductions from gross income when such payments are made in good faith and as additional compensation for the services actually rendered by the employees, provided such payments, when added to the stipulated salaries, do not exceed a reasonable compensation for the services rendered. It is immaterial whether such bonuses are paid in cash or in kind or partly in cash and partly in kind. Donations made to employees and others, which do not have in them the element of compensation or which are in excess of reasonable compensation for services, are not deductible from gross income.↩